UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, *subrogee*, and SERENITY LAKE SENIOR LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )     2:14-cv-00055-PPS-JEM ) |
| SUPERIOR CONTRACTING CORPORATION, *d/b/a* AMERICAN NATIONAL INSULATION, FIRE PROS INC., ECONOMIDES ARCHITECTS LLC, C.D. BARNES ASSOCIATES INC., | ) ) ) ) ) ) |
| Defendants. | ) |

## **OPINION AND ORDER DENYING MOTIONS TO DISMISS**

Serenity Lake Senior LLC contracted with the defendants to have a senior independent living facility built in Gary, Indiana. The winter after the facility was completed, the sprinkler system pipes froze and burst, causing damage to the building and its contents. Serenity's insurer (Great American) paid on Serenity's claim for the damage. Great American, as Serenity's subrogee, and Serenity sued a number of parties and two of those defendants, Economides Architects and Superior Contracting Corporation, now seek dismissal on the grounds that the complaint fails to state a claim. For the reasons stated herein, I **DENY** both Economides's and Superior's Motions to Dismiss for Failure to State a Claim. (DE 16, 21.)

**Factual Background**

Serenity hired Barnes Associates as Construction Manager and General Contractor for the construction of a senior citizen independent living complex. (Compl. ¶ 12.) Economides was the architect for the facility, and Serenity alleges that it was responsible for designing and specifying the insulation necessary to protect the sprinkler pipes from freezing and bursting. (Compl. ¶ 16.) Barnes hired Superior Contracting and Fire Pros as subcontractors to handle insulation and sprinkler design. (Compl. ¶ 13.) Fire Pros installed a wet sprinkler system on the ceiling of the third floor of the facility, its top floor. (Compl. ¶ 14.) Superior installed insulation in the facility's attic and the third floor ceiling under and over the sprinkler piping such that, Serenity alleges, the sprinkler pipes weren't properly protected. (Compl. ¶ 15.) Serenity further alleges that Fire Pros didn't check the insulation around the pipes immediately after installation, but certified the system ready to go nonetheless, and despite having the contract to do maintenance on the sprinkler system didn't ever notice the insulation issues. (Compl. ¶¶ 17-20.) Barnes also did inspections during construction, and didn't discover the insulation issues. (Compl. ¶ 21.)

During the winter after the facility was completed, in January 2012, the pipes froze and burst. (Compl. ¶ 22.) The broken pipes leaked water, which caused substantial damage, some of which was insured for and some of which wasn't. (Compl. ¶¶ 23-24.) Great American paid Serenity $200,833.90, and then became Serenity's subrogee for those payments. (Compl. ¶ 25.) Serenity alleges that it suffered uninsured

loss of $30,000, as well as loss of business income. (Compl. ¶ 24.) Great American and Serenity sued the parties who had a hand in designing and building the facility and the errant sprinkler system — Economides (the architect), Barnes (the general contractor), and Superior and Fires Pros (the subcontractors). (DE 4.) The ten claims sound in *res ipsa loquitur* (against Barnes, Superior and Fire Pros), negligence (against all four defendants), breach of an implied warranty of workmanship (against Superior and Fire Pros), and breach of express contract (against Barnes). Barnes also filed cross-claims against Fire Pros and Superior Contracting. (DE 37.) Presently before the Court are motions to dismiss for failure to state a claim filed separately by Economides and Superior Contracting. (DE 16 and 21, respectively.)

The contract between Serenity and Economides addresses the sprinkler system:

> SERVICES DO NOT INCLUDE the following; therefor, if required, shall be billed to the Owner:
> . . .
> * Fire Suppression design and drawings if needed.

(DE 18 Ex. 1 at 3.) It also addresses Economides's responsibilities for overseeing the contractors performing the work of building the facility:

> CONSTRUCTION: The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility. The Architect shall not be responsible for the Contractors schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor,

3

> Subcontractors, or their agents or employees, or of any other
> persons performing portions or (*sic*) the Work.

(DE 18 Ex. 1 at 4-5.) However, Economides was responsible for visiting the construction site to determine compliance with the "Contract Documents":

> **ARCHITECT'S BASIC SERVICES** for the Project shall
> include the following:
> . . .
> * Periodic Site Visits for the determination of compliance
> with the Contract Documents. Construction observation
> services shall be as set forth in the [Indiana Housing &
> Community Development Authority ("HCDA")] General
> Conditions of the Contract, which shall also be made a
> requirement of the Owner-General Contractor Agreement.

(DE 18 Ex. 1 at 2.) The applicable HCDA General Conditions are not specifically delineated. What's more, the term "Contract Documents" appears to be a defined term, but it's not defined in the Economides contract provided to the Court.[1]

The contract between Serenity and contractor Barnes is a modified version of a document entitled "AIA Document A101 - 1997 Standard Form of Agreement Between Owner and Contractor where the basis of payment is a STIPULATED SUM." (DE 22-2 at 2). The contract addresses property insurance at section 11.4 and its many subsections. One subsection is a waiver of subrogation. In effect, Serenity and Barnes agreed to waive subrogation of insurance claims paid for damage to "the Work" covered by insurance obtained pursuant to the contract. The waiver applies to claims

---

[1] The term "Contract Documents" is defined in the contract between Serenity and Barnes, which is attached to Superior's memorandum in support of its motion to dismiss. (DE 22-2 at 3.) However, it's not clear whether they are the same "Contract Documents" referred to in the Economides contract.

against subcontractors, and also requires that subcontractors provide similar waivers. (DE 22 Ex. 2 at 48, § 11.4.7.) The insurance that Serenity was required to purchase was a "builder's risk all-risk or equivalent policy form" in the amount of the building contract plus post-contracting modifications and the cost of materials installed outside of the contract. (DE 22 Ex. 2 at 47, § 11.4.1.1.) The insurance provisions apply until the contract is fully paid off or until no one other than Serenity has an insurable interest in the property for which the contract requires insurance. (DE 22 Ex. 2 at 47, § 11.4.1.)

The portion of the contract between Serenity and Barnes related to property insurance includes some subsections that are crossed out. One deletion in particular is notable and relevant for the purpose of addressing Superior's motion:

> 11.4.5: . . . [I]f after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Subparagraph 11.4.7 [(addressing subrogation waiver)] for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

(DE 22-2 at 48.) This entire subparagraph is crossed out, and just after the paragraph is handwritten the phrase "DELETE 11.4.5." (*Id.*)

Several other terms relevant to the present dispute are also defined in the Serenity-Barnes contract: the "Work" is defined as the construction and services provided pursuant to the contract; the "Project" is defined as the entire building project including work by Barnes, the subcontractors, Serenity, or other contractors (DE 22 Ex. 2

5

at 18, § 1.1.3, 1.1.4.); the "Contract Time" is the time the Barnes contract allows for "Substantial Completion" of the Work (DE 22 Ex. 2 at 37, § 8.1.1.); and "Substantial Completion" was reached when the Work was complete enough for Serenity to occupy the facility for its intended use. (DE 22 Ex. 2 at 41, § 9.8.1.)

That's a lot to digest but reading the facts in the light most favorable to the nonmoving parties, the important takeaways for the purposes of this Opinion are these: (1) the parties agreed to waive subrogation of damage that occurred during construction (i.e., while "the Work" was ongoing) that was covered by the insurance policy securing the construction; (2) the contract was over when the facility was complete, that is, complete enough for Serenity to use it as a senior living facility; (3) at the time the pipes burst, it appears that "the Work" was complete and paid for and Serenity was the only party with an insurable interest in the building; (4) the insurance provisions of the Barnes contract that applied during "the Work" ended when payment was completed and only Serenity had an insurable interest in the (now-complete) construction; and (5) the contract only required Serenity to buy insurance for the construction — after the building was complete, it was up to Serenity whether to buy insurance. The paragraph that might have continued the waiver of subrogation for insurance on the completed building was deleted from the Barnes contract. So when the pipes burst the winter after construction was complete, and the contract had ended, the construction insurance requirements and subrogation waiver no longer applied.

6

The Barnes-Serenity contract addresses the inspection to be conducted by the architect (Economides) to determine whether the Work is Substantially Complete. (DE 22 Ex. 2 at 41, § 9.8.3.) However, the Barnes contract is clear that it doesn't govern Economides's work. The contract says that it is not to be construed to create a contractual relationship between Serenity and any subcontractor or between any parties other than Serenity and Barnes, as Owner and Contractor. (DE 22 Ex. 2 at 18, § 1.1.2.)

That leads to the final contract that applies to the motions at hand, the one for Superior's services on the facility, which Barnes attached to its cross-claim against Superior. (DE 37 Ex. 2.) The first page of the contract describes it as an agreement "between the following parties," and then it lists Barnes, Superior, Serenity, and Economides, after a colon that follows a listing of each party's role. Under the contract, Superior was required to name both the owner and the contractor as additional insured parties on its general liability insurance policy. (DE 37 Ex. 2 at 6, § 6.3.3.) Perhaps most notable, however, is what appears to be an express warranty for defective work addressed to the owner, architect and contractor:

> 7.9.1 Subcontractor warrants to Owner, Architect, and Contractor . . . that all Work under this Subcontract shall be of good quality, free from faults and defects and in conformance with the Contract Documents for a period of one year from the Date of Substantial Completion. . . . Subcontractor agrees to repair, or replace, at Contractor's option, and with no cost to Owner or Contractor, any defective work. This Warranty shall be in addition to, and not in limitation of, any other warranty or remedy required by law or by the Contract Documents. . . .

(DE 37 Ex. 2 at 8, § 7.9.1.)

## Jurisdiction and Choice of Law

My jurisdiction arises under 28 U.S.C. section 1332 because no defendant is a citizen of the same state as any plaintiff, and the amount in controversy exceeds $75,000.[2] The case is removable under section 1441(b)(2) because no defendant is a citizen of Indiana, the state in which the case was brought.

Because this is a case invoking diversity jurisdiction, my first task is to determine what law applies. The Barnes contract has a governing law provision in favor of the place where the Project is located, meaning Indiana. (DE 22 Ex. 2 at 50.) Economides, Superior and Serenity all refer to Indiana law and don't address choice of law. I apply the conflict-of-laws rules of Indiana, the state in which I sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Indiana's choice of law rule for actions on contract calls for applying the law of the forum with the most intimate contacts to the facts." *Dohm & Nelke, Div. of Cashin Systems Corp. v. Wilson Foods Corp.*, 531 N.E.2d 512, 513 (Ind. Ct. App. 1988) (citation omitted). Here, the facility is in Indiana, the contracts were

---

[2] For the purpose of being assured that diversity jurisdiction is proper in this case, I will note the parties' citizenship. Plaintiffs are citizens of Ohio or Indiana: Great American is an Ohio corporation with its principal place of business there, and Serenity is an Indiana limited liability company whose sole member is an individual who resides in Indiana. Defendants are citizens of Michigan or Delaware: Economides is a Michigan limited liability company whose sole member resides in Michigan, Superior is a Delaware corporation with its principal place of business in Michigan, Fire Pros is a Michigan corporation with its principal place of business in Michigan, and Barnes is a Michigan corporation with its principal place of business in Michigan. (Compl. ¶¶ 1-6; DE 1 ¶¶ 5-12.)

all performed (at least in part) in Indiana, and the pipes burst in Indiana. So I agree with the parties that Indiana law applies here.

**Motion to Dismiss**

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I must accept all factual allegations as true and draw all reasonable inferences in the complainant's favor, but I don't need to accept threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 556 U.S. at 678. The first step in my analysis is to identify and disregard all "allegations in the complaint that are not entitled to the assumption of truth," especially including any legal conclusions. *Id.* at 680-81. Then I must look at the remaining allegations to determine whether they *plausibly* — and not merely possibly or conceivably — suggest an entitlement to relief. *Id.* at 681, 683.

Before diving into the merits, I need to say a few words about the briefing: the present motions revolve around the language of various contracts that form the basis of the parties' relationships. Yet from what I've seen in the briefing, the parties don't seem to have closely read those contracts. For example, the defendants have pointed out certain sections of the contracts, but have omitted other ones that seem to be crucial to the ultimate disposition of this matter. For their part, the plaintiffs have leaned heavily

9

on a general argument about the intent of contracting parties that would make dismissing any contract claim basically impossible, and would blow the parol evidence rule out of the water. In all events, I have endeavored to carefully read all of the contracts in ruling on the pending motions, something the parties might also be well advised to do.

1. **Economides's Motion to Dismiss**

The plaintiffs allege that architect Economides was negligent in its duties, and that negligence resulted in the sprinkler pipes not being adequately protected from the cold. Economides argues that its contract with Serenity explicitly ruled out responsibility for the sprinkler system or for the performance of other contracted parties. An architect is responsible for project mishaps as far as the owner contracts for, and no further. *See, e.g.*, *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011) ("an architect is not required to be an insurer of a contractor's work"); *Greenhaven Corp. v. Hutchcraft & Assoc., Inc.*, 463 N.E.2d 283, 285 (Ind. Ct. App. 1984) ("architect's duties to his employer depend upon the agreement he has entered into with that employer"). A standard of reasonable care and professional competence applies to the work done pursuant to contract: "The responsibility of an architect is similar to that of a lawyer or physician. When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires. Thus, the key question in determining whether an architect has been negligent is not whether error occurred, but whether the architect breached a duty to exercise the degree of

competence ordinarily exercised in like circumstances by reputable members of the profession." *Mayberry Café, Inc. v. Glenmark Constr. Co.*, 879 N.E.2d 1162, 1173 (Ind. Ct. App. 2008) (quotation marks, citations omitted); *see also*, *Strauss Veal Feeds, Inc. v. Mead & Hunt, Inc.*, 538 N.E.2d 299, 303 (Ind. Ct. App. 1989) ("An architect is bound to perform with reasonable care the obligations for which it contracted and is liable for failing to exercise professional skill and reasonable care in preparing plans and specifications according to its contract." (citations omitted.)).

The fact that the plaintiffs sued Economides only under a tort theory may be important. I will discuss that briefly, for the parties' consideration, although they didn't raise it.[3] It doesn't change the outcome here but it may affect damages recoverable from Economides later on. Indiana recognizes the economic loss doctrine. Under it, in short, when the provider of a good or service is sued for damage to *that* good or service, contract law governs. When there's personal injury or damage to *other* property, tort law comes into play. *See*, *Indianapolis-Marion County Public Library v. Charlier Clark*, 929 N.E.2d 722, 726-27, 731 (Ind. 2010). Here, the parties contracted for the production of the building, so it's likely the plaintiffs may only recover for damage to the building itself under a contract theory. *See*, *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011) ("It is not clear that a plaintiff may now, any longer, be able to state a negligence claim against an architect with respect to problems that arise during a

---

[3] Superior did make this argument, so the impact is discussed in more detail below.

construction project, as opposed to purely contractual claims, where the plaintiff has suffered only economic loss."). That wouldn't knock out the claim against Economides here because Serenity claims damage to other property as well, so the claim can proceed with respect to at least those other damages, and I don't need to decide the issue now.

In its briefing, Economides argues that its duty is determined by the contract it signed with Serenity. Serenity has not persuasively argued to the contrary so I will assume without deciding that Economides's approach is correct. Although the plaintiffs didn't attach the contract to the complaint, it is "well-settled in [the Seventh] [C]ircuit that 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.' . . . While narrow, this exception is 'aimed at cases interpreting, for example, a contract.'" *188 LLC v. Trinity Indus. Inc.*, 300 F.3d 730, 735 (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). So I will consider the Economides-Serenity contract as if it were attached to the complaint.[4] And if the contract "contradicts allegations in the complaint to which it is attached, the

---

[4] Economides attached its contract to an affidavit, along with drawings of the facility. (*See* DE 18 and De 18 Ex. 2.) As I've noted, I am very limited in the evidence that I can consider under the motion to dismiss rubric – the contract clearly qualifies for the exception, but I'm not convinced that an affidavit and blueprints do. I therefore won't consider either of those documents, except that I accept the affidavit as the vehicle by which the Economides contract was filed.

[contract] trumps the allegations." *Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (citations omitted).

In adjudicating a contract dispute, where a written contract addresses the disputed subject matter, the plain language of the contract governs. Here is how Indiana courts set out the standard for contract interpretation:

> Where terms of a contract are clear and unambiguous, we will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms. If necessary, the text of a disputed provision may be understood by referring to other provisions within the four corners of the document. The four corners rule states that where the language of a contract is unambiguous, the parties' intent is to be determined by reviewing the language contained within the "four corners" of the contract, and "parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." Extrinsic evidence cannot be used to create an ambiguity.

*John M. Abbott v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014) (citing *Claire's Boutiques, Inc. v. Brownsburg Station Partners LLC*, 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013); quoting, citing *Adams v. Reinaker*, 808 N.E.2d 192, 196 (Ind. Ct. App. 2004)). On the other hand, "[i]f a contract is ambiguous or uncertain and its meaning must be determined by extrinsic evidence, its construction is a matter for the fact finder." *Plainfield v. Paden Eng'g Co.*, 943 N.E.2d 904, 909 (Ind. Ct. App. 2011).

It appears from the contract that Economides wasn't specifically responsible for the fire suppression system. However, it was responsible for inspecting construction for compliance with the "Contract Documents." Economides's inspection responsibilities

13

were purportedly set forth in the HCDA General Conditions of the Contract. It's possible that AIA Document A201-1997, which is subtitled "General Conditions of the Contract for Construction" is the same as the HCDA General Conditions, but that fact doesn't seem to be offered in the record. If those are the same General Conditions, I can't divine from them whether Economides should have done more to prevent the sprinkler pipes from bursting. The Index lists many provisions addressing the Architect's authority, responsibility, services, approvals, and inspections (DE 22 Ex. 2 at 12), but none of these is directly on point regarding the sprinkler system issue we face, and the parties' respective roles and responsibilities require explanation.

For instance, under the General Conditions, the Architect was the Owner's representative, and was supposed to be aware of the quality of the work being done, although it wasn't expected to have an all-seeing eye. (*See, e.g.*, DE 22 Ex. 2 at 27, § 4.2.2.) Additionally, under its own contract Economides was responsible for "Heating, Ventilating, and Air Conditioning design" (DE 18 Ex. 1 at 2), which may have included responsibilities relating to general insulation, including standard insulation that might have protected the sprinkler pipes from the cold (even if that wasn't the insulation's primary purpose). It's also plausible that Economides should have produced its design differently to better accommodate a properly-protected fire suppression system (such a system is mentioned in the contract, so it seems clear that Economides knew there would be one, but it would be designed by someone else). These questions make the terms of the architect-owner contract with respect to Economides's responsibilities vis-

14

à-vis the fire suppression system neither clear nor unambiguous. I'm not at all saying that Economides's inspection or design responsibilities make it liable for the water damage — I'm simply saying I can't decide at this point that it's unequivocally *not* liable.

### 2. Superior's Motion to Dismiss

Superior's motion to dismiss is advanced on three different grounds. Superior argues that all of the plaintiffs' claims against it are barred by the waiver of subrogation clause in Serenity's contract with general contractor Barnes. (*See* DE 22 Ex. 2 at 38, § 11.4.7.) It also argues that the tort claims (under theories of *res ipsa loquitur* and negligence) are barred by Indiana's economic loss doctrine. Finally Superior seeks dismissal of the claim for breach of implied warranty of workmanship leveled against it because the plaintiffs lack privity of contract with Superior. (DE 22 at 1.)

In its first argument, Superior has made what can charitably be described as incomplete references to the contract. That's the polite way to say it. Others might describe the tactic as downright misleading. Here's what Superior has done: it has relied on the waiver of subrogation clause in the contract between owner Serenity and contractor Barnes. In doing so it has attached a poor photocopy of the contract[5] that is nearly impossible to read at times, then quoted from that contract selectively and

---

[5] Like the Economides contract, the Barnes-Serenity contract is essential to Serenity's claims. Serenity's perhaps artful decision to omit the contract won't prevent me from considering the operative contracts with respect to Superior's motion to dismiss.

strategically. Superior points to the decision in *Midwestern Indemnity Co. v. Sys. Builders, Inc.*, where the Indiana Court of Appeals "relied upon the same waiver of subrogation clause at issue here in an action by an insurer seeking recoupment of insurance proceeds paid because of damage to an alleged negligently constructed building." (DE 22 at 5 (citing 801 N.E.2d 661 (Ind. Ct. App. 2004).) The contract language quoted in *Midwestern Indemnity* does seem to be from the same form document at issue in this case, although the subparagraph that applied to insurance on the completed Project was there numbered 11.3.5 instead of 11.4.5. But Superior fails to tell me that in this case, unlike in *Midwestern Indemnity*, the insurance and waiver of subrogation paragraph that applies to the *completed* Project (11.4.5 here) is crossed out. *That* paragraph was actually the basis for the Indiana court's affirming the grant of summary judgment to a subcontractor on an owner's and insurer's subrogation claim for damage to a completed building project: "Like the Georgia Court of Appeals, we also find that Section 11.3.5 of the AIA construction contract is controlling. . . . Thus, although [the subcontractor] had completed its construction on the project, Section 11.3.5 of the contract provides that [the owner] 'shall waive all rights in accordance with the terms of Subparagraph 11.3.7.'" *Midwestern Indem. Co.*, 801 N.E.2d at 669.

Under the operative contract in *this* case, the parties agreed to waive subrogation of damage during construction that was covered by the insurance policy securing the construction. The contract ended when the facility was complete, that is, complete enough for Serenity to use it as a living complex for seniors. The property insurance

16

requirements of section 11.4 of the Barnes contract only applied until final payment was made or until nobody other than Serenity had an insurable interest in the property that the contract required to be covered. There is no indication in the record that Serenity hadn't finished paying, or that Barnes or Superior or anyone other than Serenity had an insurable interest in the building. Section 11.4.5, which could have extended Serenity's waiver of subrogation to insured claims covered by insurance on the completed building, was deleted from the contract here. The pipes burst the winter after construction was complete, when the contract had ended and the waiver of subrogation wasn't extended to insurance on the completed building. Neither the construction insurance requirements nor the waiver of subrogation still applied.

In any event, Serenity alleges that it suffered $30,000 of uninsured loss under the general rubric of property damage. (Compl. ¶ 24.) This wasn't paid by insurance, so subrogation is irrelevant to Serenity's direct claims. The issue of allegation of uninsured property damage leads into Superior's second argument.

Superior's second argument is that the *res ipsa* and negligence tort claims are barred by the economic loss doctrine. "[C]ontract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected." *Indianapolis-Marion County Public Library v. Charlier Clark*, 929 N.E.2d 722, 731 (Ind. 2010) (quoting *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005)). The Indiana Supreme Court has stated that "'pure economic loss' means pecuniary harm not resulting from an injury to the plaintiff's person or property." *Id.* at

17

731. Tort law applies "if the defect causes personal injury or damage to property other than the [contracted-for] product or service itself." *Id.* at 726, 731 (citing *Gunkel*, 822 N.E.2d at 153).

Here, the economic loss doctrine would apply to damage to the product that was contracted for, but it wouldn't apply to damage to *other property*. For example, the doctrine wouldn't preclude claims for water damage to personal property contained within the facility when the sprinklers burst. Such damage is plausible and adequately noticed in the plaintiffs' Complaint. The economic loss doctrine therefore doesn't apply to completely bar the tort claims here. I note, however, that the parties should be sure to develop information during discovery to differentiate between damages for which tort claims are barred by the economic loss doctrine and ones for which they aren't.

Superior's third and final argument for dismissal is that the plaintiffs' claim for breach of implied warranty of workmanship is barred because there is no privity of contract between the plaintiffs and Superior. (DE 22 at 8.) The argument is based on the fact that usually only the parties to a contract or those in privity with a party may recover under the contract. However, a third-party beneficiary may also enforce the contract. *See Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 971 (Ind. Ct. App. 2013) (citing *Centennial Mortg., Inc. V. Blumenfeld*, 745 N.E.2d 268, 275 (Ind. Ct. App. 2001)). "In order to enforce a contract by virtue of being a third-party beneficiary, an entity must show (1) a clear intent by the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third

18

party; and (3) performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Id.* at 971 (citing *Centennial Mortg.*, 745 N.E.2d at 276). Intent is the most important factor. *Id.*

The intent of the parties is ambiguous at best (for Superior). Owner Serenity is mentioned throughout the Superior contract as a beneficiary to which Superior owed duties: Serenity is arguably a party to the contract, Superior's work must be satisfactory to Serenity, Superior had to name Serenity as an additional insured party, and Serenity is an explicit beneficiary of Superior's express warranty of its work. *See supra.* (DE 37 Ex. 2.) Given the face of the contract and Serenity's claims as they are pleaded, lack of privity can't prevail as the basis for Superior's motion to dismiss.

## Conclusion

For the foregoing reasons, defendant Economides Architects LLC's (DE 16) and Superior Contracting Corporation's (DE 21) motions to dismiss are **DENIED**.

**SO ORDERED**.

ENTERED: November 4, 2014

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**